# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY KENNEDY, *Plaintiff*, v. BERKEL & COMPANY CONTRACTORS, INC., *et al.*, *Defendants.* | Civil Action No. 17-1248 (DLF) |

## MEMORANDUM OPINION

Kimberly Kennedy alleges that her boss, Dwayne Bruce, repeatedly raped and abused her during her six weeks of employment with Berkel & Company Contractors. She brings twenty-four counts against Bruce and Berkel, including claims of sex-based discrimination, religious discrimination, retaliation, sexual harassment, discriminatory termination, and numerous torts. Before the Court is the defendants' Motion to Dismiss eighteen of those counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 13. For the reasons that follow, the Court will grant the motion in part and dismiss seven counts.

## I. BACKGROUND

The Court will recount the facts set forth in the complaint, which is presumed truthful at this stage. Kennedy moved to the District of Columbia in summer 2015 without employment. Compl. ¶ 7, Dkt. 1. She lived in a homeless shelter while looking for work in the construction industry. *Id.* Bruce, whom Berkel employed as a work-site superintendent, hired Kennedy as a skilled laborer for his work site on August 20, 2015, and she began work that day. *Id.* ¶¶ 9–13.

Kennedy was the only female of Berkel's approximately ten employees at the work site. *Id.* ¶ 17.

In Kennedy's first days of work, Bruce assigned her to the role of directing traffic, though all of the male employees were assigned to excavate a foundation. *Id.* ¶ 23. Kennedy attempted to assist the other employees with excavation when there was no traffic to direct, but Bruce told her to find other work. *Id.* Kennedy then asked if she could join the male employees because she had experience with excavation, but Bruce denied the request, reasoning that "women are distracting" and the other employees might be injured. *Id.* ¶¶ 24–25. Bruce instead assigned Kennedy to lay asphalt in a secluded area that was out of the other employees' view and to clean the trailer he used as his office. *Id.* ¶ 26. On one occasion during these first days, Bruce saw Kennedy talking with another company's construction workers and threatened to fire her if she spoke with them again. *Id.* ¶ 27.

After isolating Kennedy from the other workers, Bruce began sexually harassing her. On a daily basis, he flirted with her, asked her if she was in a relationship, and commented on her curves and physical appearance. *Id.* ¶ 29. Kennedy, who is celibate pursuant to her religion, repeatedly told Bruce that his advances made her uncomfortable and that she is religious and does not date outside marriage. *Id.* ¶ 30. But Bruce continued to inquire into Kennedy's personal life and at one point asked her to be his girlfriend. *Id.* ¶ 31. When Kennedy repeated that she does not date outside of marriage because it is against her religion, Bruce refused to accept the rejection and claimed that he saw in her eyes that she liked him. *Id.*

Once when Kennedy was cleaning the trailer alone, Bruce entered and demanded a hug, which Kennedy refused. *Id.* ¶ 33. The next day, Bruce hugged Kennedy without her consent and asked her how it felt. *Id.* Kennedy responded that the hug made her feel "not good" and

guilty. *Id.* But Bruce continued to hug her on a near-daily basis without her consent. *Id.* ¶ 34. He sometimes asked her if his hugs made her feel guilty, and she responded that they did because of her religious beliefs. *Id.* Kennedy recounts that she felt powerless to stop Bruce because she feared losing her job and being unable to leave the homeless shelter. *Id.* ¶ 35.

Bruce's harassment and assaults soon escalated. Every day, Bruce hugged Kennedy and rubbed his body against hers. *Id.* ¶ 37. Several times each day, Bruce approached Kennedy from behind and rubbed his erect penis on her buttocks. *Id.* One day, Bruce exposed his penis to Kennedy and then called her cell phone to ask her about it after she fled. *Id.* ¶ 40. Another day, Bruce entered the trailer, grabbed Kennedy's face, and forcibly kissed her despite her attempt to escape. *Id.* ¶ 38. Bruce then gave Kennedy uninvited kisses every day at work. *Id.* ¶ 39. On several occasions he put his hands up Kennedy's shirt and grabbed and kissed her breasts. *Id.*

On September 23, 2015, Kennedy's birthday, Bruce told her that he had a present for her and insinuated with his tongue that he would perform oral sex on her. *Id.* ¶ 41. A few days later, Bruce entered the trailer, forcibly kissed Kennedy, unzipped his pants, and repeatedly slapped Kennedy's face with his penis. *Id.* ¶ 42. When Kennedy resisted Bruce's attempt to force his penis into her mouth, he became angry and forced her to perform oral sex on him. *Id.* Bruce again forced Kennedy to perform oral sex on him on three other days. *Id.* ¶ 43. On one occasion, Bruce told Kennedy not to accept a phone call while he was assaulting her because she was doing her "job." *Id.* ¶ 45.

On September 30, Bruce became angry upon seeing Kennedy make small talk with other Berkel superintendents. *Id.* ¶ 47–48. Bruce handed Kennedy a final paycheck and told her that despite previous plans she would not be transferred to the next work site because the other

superintendents said she was "too soft." *Id.* ¶¶ 49–50.  When Kennedy began to cry, Bruce told her that "this is why I don't like to hire women." *Id.* ¶ 49.

Kennedy left the work site but returned later that day, hoping to change Bruce's mind. *Id.* ¶ 52.  When Kennedy entered Bruce's trailer to ask for her job back, Bruce forced his penis into her mouth and vagina as she cried. *Id.* ¶ 53.  After the rape, Bruce told Kennedy he would call her later about the job, and she left. *Id.*

Kennedy was hired by another construction company several days later. *Id.* ¶ 55.  Bruce told other Berkel employees that the assaults were consensual, and the Berkel employees began mocking Kennedy as promiscuous when they saw her with her new construction company. *Id.* ¶ 56.

In the months after her employment at Berkel, Kennedy suffered from severe depression and suicidal thoughts. *Id.* ¶ 57.  This prevented her from maintaining a job.  After leaving the second construction company, Kennedy was hired by the Laborers' International Union of North America as an audit clerk, but she was fired because she could not focus, retain information, or learn new tasks. *Id.* ¶ 61.  In August 2016, Kennedy's emotional trauma required hospitalization, and she was diagnosed with post-traumatic stress disorder and prescribed medication. *Id.* ¶ 58.  At the time the complaint was filed in June 2017, Kennedy was receiving weekly treatment and still struggled daily with depression. *Id.* ¶ 59.

Kennedy's suit was reassigned to the undersigned judge on December 5, 2017.

## II. LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter

4

sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 557 ("Factual allegations must be enough to raise a right to relief above the speculative level."). A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624

(D.C. Cir. 1997). A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III. ANALYSIS

The complaint contains twenty-four counts, and the defendants move to dismiss eighteen of them. (The other six are claims for sex-based discrimination and retaliation.) The complaint's federal questions and the parties' diversity of citizenship confer subject-matter jurisdiction on the Court. *See* Compl. ¶ 1; 28 U.S.C. §§ 1331, 1332(a), 1367(a).

Kennedy's statutory claims are based on Title VII of the Civil Rights Act of 1964 and the District of Columbia Human Rights Act. The D.C. Court of Appeals generally interprets the D.C. Human Rights Act as operating in parallel to Title VII. *See, e.g.*, *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (observing that the D.C. Court of Appeals "follow[s] cases construing Title VII in interpreting and applying the provisions of the [D.C. Human Rights Act] . . . to the extent that the acts use similar words and reflect a similar purpose"). Kennedy sues both Berkel and Bruce under the D.C. Human Rights Act and only Berkel under Title VII.

### A. Religious Discrimination

Kennedy asserts four counts of religious discrimination: (1) hostile work environment under Title VII; (2) hostile work environment under the D.C. Human Rights Act; (3) discriminatory termination under Title VII; and (4) discriminatory termination under the D.C. Human Rights Act. *See* Compl. ¶¶ 86–93, 101–105, 131–139, 147–150. Both statutes prohibit an employer from discriminating against an employee on the basis of religion with respect to the employee's terms or conditions of employment. 42 U.S.C. § 2000e-2(a)(1); D.C. Code § 2-1402.11(a). The defendants argue that these counts fail for several reasons.

First, the defendants argue that the Title VII counts must be dismissed because Kennedy failed to exhaust her administrative remedies.[1] Defs.' Mem. at 6–8, Dkt. 13. Title VII requires a person alleging a violation to file a charge with the Equal Employment Opportunity Commission (EEOC) before bringing a civil suit. 42 U.S.C. § 2000e-5(f)(1); *see also Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) ("Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." (internal quotation marks and alterations omitted)). The EEOC provides a form for discrimination charges that directs the complainant to check boxes corresponding to their alleged form(s) of discrimination (race, religion, etc.) and also asks the complainant to describe the particular details of the charge in the complainant's own words. *See* Dkt. 13-1. Kennedy checked the "religion" box, along with the "sex" and "retaliation" boxes, but did not describe any specifically religion-based form of discrimination in the details section. *Id.* The defendants argue that Kennedy's failure to present facts concerning religious discrimination in the details section dooms her Title VII claims.

The exhaustion requirement is not so unforgiving. The requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks and alteration omitted). Because notice is the goal, the exhaustion requirement "should not be construed to place a heavy technical burden on individuals untrained in negotiating procedural labyrinths." *Id.* (internal quotation marks omitted). Here, Kennedy put

---

[1] Title VII plaintiffs are not required to plead or demonstrate exhaustion in their complaints, *see Jones v. Bock*, 549 U.S. 199, 212, 216 (2007), but a defendant may raise exhaustion as an affirmative defense in a motion to dismiss "when the facts that give rise to the defense are clear from the face of the complaint," *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). Here, the facts relevant to the exhaustion defense are clear from Kennedy's EEOC charge, which is incorporated by reference in the complaint and attached to the motion to dismiss. *See* Compl. ¶ 6; Dkt. 13-1.

the defendants and EEOC on full notice that she alleged religious discrimination when she checked the box corresponding to religious discrimination. *See Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 307 n.9 (D.D.C. 2015) (collecting cases for the proposition that "[i]t is where plaintiffs have neither checked the correct box nor given some sort of notice of the substance of their claims in the [details section] that courts will dismiss for failure to adequately exhaust administrative remedies"). And nothing in the details section suggested that Kennedy was *not* pursuing a religion-based claim. While Kennedy could have added explanation of the religion allegation in the details section, explanation is not required.

Next, the defendants argue that the complaint inadequately alleges a hostile work environment based on religious discrimination. Defs.' Mem. at 9–10. An employer violates Title VII and the D.C. Human Rights Act with discriminatory conduct that is "severe or pervasive enough to create an [objectively and subjectively] hostile or abusive work environment" and thus "alter[s] the conditions of the victim's employment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted); *see also Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1245 (D.C. 2009) (applying the *Forklift Systems* standard to a D.C. Human Rights Act claim). This is not a "mathematically precise test," but *Forklift Systems* mentions as relevant factors (1) "the frequency of the discriminatory conduct;" (2) "its severity;" (3) "whether it is physically threatening or humiliating;" (4) "whether it unreasonably interferes with an employee's work performance;" and (5) "[t]he effect on the employees psychological well-being." 510 U.S. at 22–23.

Kennedy sufficiently alleges that Bruce created a hostile work environment based on her religion. According to the complaint, Kennedy repeatedly told Bruce that she did not date outside marriage because of her religious beliefs, yet he repeatedly touched and harassed her

sexually. *See generally* Compl. Bruce once mocked Kennedy as "trying to be a minister" when she refused to date him. *Id.* ¶ 32. Upon learning that a nonconsensual hug made Kennedy feel guilty, Bruce hugged her again and asked if it again made her feel guilty. *Id.* ¶¶ 33–34. After Kennedy replied that it did because of her religious beliefs, Bruce hugged her on a near-daily basis. *Id.* ¶ 34. And if Kennedy's religious beliefs placed extramarital dating and opposite-sex hugs off limits, Bruce flagrantly violated those beliefs by rubbing his erect penis on her buttocks. Bruce did that *several times each day*. *Id.* ¶ 37. These egregious violations of Kennedy's religious code meet all five factors mentioned in *Forklift Systems*: they were frequent, severe, physically threatening and humiliating, an unreasonable interference with Kennedy's work performance, and psychologically damaging. And while Bruce's alleged conduct would have created a hostile work environment for anyone, religious or not, the complaint allows for the inference that Bruce's behavior—accompanied by his mocking of Kennedy's religious scruples—was motivated at least partly by Kennedy's religious beliefs. *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."); D.C. Code Ann. § 2-1402.11(a) (prohibiting acts done "wholly or partially for a discriminatory reason").

Finally, the defendants argue that the discriminatory-termination claims fail on the grounds that Bruce did not know Kennedy's specific religion and that the complaint does not allege a causal link between the termination and religious animus. Defs.' Mem. at 13–14. The defendants are wrong to argue that an employer must know an employee's religion in order to discriminate against the employee on the basis of religion. An employer undoubtedly violates Title VII by firing an employee because the employee reads scripture even if the employer does

9

not know what scripture the employee reads. *See* 42 U.S.C. § 2000e(j) ("The term 'religion' includes all aspects of religious observance and practice, as well as belief . . . .").

But the defendants are correct that the complaint does not adequately plead causality between the termination and religious discrimination. "Under Title VII, . . . the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Because "the ordinary rules for assessing the sufficiency of a complaint apply" to a Title VII motion to dismiss, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), Kennedy must plead facts with enough specificity to allow the Court, taking the factual allegations as true, to draw the reasonable inference that she was fired because of her religion, *see Iqbal*, 556 U.S. at 678.

The complaint strongly suggests that Kennedy was fired because of her sex and because, contrary to Bruce's instructions, she spoke with other Berkel employees. *See* Compl. ¶¶ 48–49 (After "Bruce observed [Kennedy] interacting with [other employees] and was angry," he "handed [Kennedy] a final, handwritten paycheck and stated that he was not transferring her to another site . . . ."); *id.* ¶ 49 ("Bruce . . . stated that he was not transferring [Kennedy] to another site because . . . other superintendents said she was 'too soft,' which she understood to be a reference to her sex. [Kennedy] started crying. Bruce told her 'this is why I don't like to hire women.'"). In contrast, the complaint contains nothing to suggest that Kennedy's religious practices or beliefs had anything to do with her termination. Therefore, Kennedy's discriminatory-termination counts must be dismissed.

### B. Quid Pro Quo Sexual Harassment

Sexual harassment can violate Title VII and the D.C. Human Rights Act by effectively altering an employee's terms and conditions of employment. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 752 (1998). Two kinds of sexual-harassment claims are common: those alleging that the harassment created a hostile work environment and those alleging a quid-pro-quo exchange of employment benefit for sexual favors. *Id.* at 751–752. Kennedy pleads both; the defendants move to dismiss only the quid-pro-quo claims.

An employer is liable for quid-pro-quo harassment "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." *Id.* at 753. When a claim "involves only unfulfilled threats, it should be categorized as a hostile work environment claim." *Id.* at 754. The distinction, in other words, is that quid-pro-quo harassment involves "threats [that] are carried out," while hostile-work-environment harassment involves "offensive conduct in general." *Id.* at 751, 753; *see also Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999) ("Courts describe an explicit alteration [of the terms or conditions of employment] as 'quid pro quo' harassment and a constructive alteration as 'hostile work environment' harassment.").

Kennedy does not allege that Bruce terminated her employment because of a refusal to submit to his sexual demands; indeed, in the weeks leading up to her termination, Bruce succeeded in assaulting Kennedy repeatedly, despite her continual efforts to thwart his sexual demands. Instead, Kennedy alleges that Bruce terminated her employment because she spoke with other Berkel employees and was "soft." Compl. ¶ 49. Her sex-discrimination claim is based on severe and pervasive offensive conduct and is therefore properly categorized as alleging a hostile work environment. Accordingly, the Court will dismiss the quid-pro-quo

claims. But it makes no real difference—Kennedy's sex-based hostile-work-environment claims, which survive, fully encompass the allegations that compose the quid-pro-quo claims. *See Lutkewitte v. Gonzales*, 436 F.3d 248, 260 (D.C. Cir. 2006) (Brown, J., concurring in the judgment) (describing the difference between hostile-work-environment harassment and quid-pro-quo harassment and citing *Elleth* for the proposition that "[o]nce actionable sexual harassment of either type has been shown . . . the old labels are no longer useful").

### C. Negligence and Intentional Infliction of Emotional Distress

The complaint pleads common-law claims for negligence and negligent hiring and supervision against Berkel and both intentional and negligent infliction of emotional distress against Bruce. Compl. ¶¶ 158–164, 165–170, 201–204, 205–210. The defendants argue that the D.C. Worker's Compensation Act bars these claims. Defs.' Mem. at 15–17, 20. The Act "makes [an] employer liable without fault if [an] employee's occupational injury or death falls within the scope of the Act, but as a *quid pro quo* for such automatic liability, the Act provides the employee's exclusive remedy—an administrative remedy—against the employer for injuries within its reach." *Estate of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 630 (D.C. 1995) (citations omitted); *see also* D.C. Code §§ 32-1503, 32-1504(a). In other words, an employee cannot file suit to redress an injury that is redressable by the Act.

The defendants' argument fails because injuries caused by sexual harassment fall outside the Act's reach. The Act defines "injury" as "accidental injury or death arising out of and in the course of employment." D.C. Code § 32-1501(12). The D.C. Court of Appeals has interpreted "injury . . . arising out of . . . employment" as occurring only "as the result of a risk involved in or incidental to the employment." *Estate of Underwood*, 665 A.2d at 634. Sexual harassment, "as a matter of law," is not "a risk involved in or incidental to employment." *Id.* (internal

quotation marks omitted). Because Kennedy's injuries do not fall within the Act's scope, the Act does not prevent her from seeking redress here.

The defendants also argue that Kennedys' tort claims fail because they are predicated on violations of the D.C. Human Rights Act or Title VII, Defs.' Mem. at 17–20, but this argument fares no better. It is true that a common-law negligent-supervision claim "may be predicated only on common law causes of action or duties otherwise imposed by the common law," and the common law "did not recognize an employer's duty to prevent . . . sexual harassment" when unaccompanied by "independently tortious conduct." *Griffin v. Acacia Life Ins.*, 925 A.2d 564, 576 & n.31 (D.C. 2007). But Kennedy alleges independently tortious conduct. *See Griffin*, 925 A.2d at 576 ("The common law . . . imposed on employers . . . [t]he duty to provide a safe place to work."). The D.C. Human Rights Act does not "preempt[] or otherwise abolish[] common law causes of action based on the same set of operative facts" as those underlying a statutory claim. *Griffin*, 925 A.2d at 577. An employee may pursue both a D.C. Human Rights Act claim and "a negligent supervision claim predicated on a battery," for example, "under a theory that the employer was negligent in allowing the battery to happen." *Id.* That is precisely the theory Kennedy is pursuing. Likewise, Title VII does not preclude Kennedy's tort claims. "When, as here, the victim of a discriminatory act alleges a harm apart from discrimination, Title VII does not preclude her from suing under a common law tort theory to remedy that distinct injury." *Boyd v. O'Neill*, 273 F. Supp. 2d 92, 96 (D.D.C. 2003). Kennedy's tort claims are based on Bruce's rape and sexual and verbal abuse and Berkel's failure to provide a safe place to work; these alleged wrongs are plainly distinct from discrimination.

The defendants resist this conclusion with respect to the intentional infliction of emotional distress claim on the ground that Kennedy pleaded that Bruce intentionally inflicted

13

emotional distress upon her through, "*inter alia*, his pattern of sexual harassment and repeated verbal abuse." Compl. ¶ 202. The defendants argue that this focus on harassment and verbal abuse prevents the claim from reaching Bruce's assaults. Defs.' Reply at 9, Dkt. 15. That is not so: the complaint explicitly states that its references to sexual harassment and verbal abuse do not exhaust the bases for the claim ("inter alia" being the key term). Pleading, moreover, is not "a game of skill in which one misstep by counsel may be decisive to the outcome." *Swierkiewicz*, 534 U.S. at 514. The complaint contains more than enough to adequately allege an independent claim for intentional infliction of emotional distress.

The claim for negligent infliction of emotional distress must be dismissed without prejudice, however, because Kennedy concedes that it was improperly pleaded against Bruce instead of Berkel. *See* Kennedy Opp'n at 24–25, Dkt. 14.

### D. Wrongful Termination

Kennedy alleges common-law wrongful termination on the ground that she was "terminated because of her sex and religion when she opposed Defendant Bruce's sexual advances and harassment." Compl. ¶ 174. Kennedy was apparently an at-will employee. *See* Defs.' Mem at 20; Kennedy Opp'n at 26 (not contesting the defendants' claim that Kennedy's employment was at-will); *Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 249 n.29 (D.C. 2016) (observing that in D.C., "there is a presumption that . . . employment is terminable at will by any party at any time"). That is usually enough to fell a wrongful-termination claim: "[i]t has long been settled in the District of Columbia that an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Bereston v. UHS of Delaware, Inc.*, 180 A.3d 95, 104 (D.C. 2018) (quotation marks omitted). The D.C. Court of Appeals "has recognized a designedly narrow exception to this common-law rule, under which an at-will

14

employee may have a claim sounding in tort for wrongful discharge if the employer's sole (or at least predominant) reason for terminating the employee was the employee's refusal to break the law or was in some other respect contrary to a clear mandate of public policy," *id.* (internal quotation marks omitted), but the Court of Appeals has emphasized that courts should consider arguments invoking this narrow exception only if they "reflect a clear mandate of public policy . . . that has been officially declared in a statute or municipal regulation, or in the Constitution," *Rosella v. Long Rap, Inc.*, 121 A.3d 775, 778 (D.C. 2015) (quotation marks omitted). The Court of Appeals has also emphasized that "there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination." *Rosella*, 121 A.3d at 778 (quotation marks omitted). The public policy that Kennedy invokes is D.C.'s prohibition of prostitution. *See* Kennedy Opp'n at 27; D.C. Code §§ 22-2701(a), 22-2701.01(3) (making it "unlawful for any person to engage in prostitution" and defining prostitution as "a sexual act or contact with another person in return for giving or receiving anything of value").

Kennedy's argument is flawed. First, the complaint alleges that Bruce repeatedly sexually assaulted Kennedy—hardly the quid-pro-quo exchange contemplated by the D.C. statute. The complaint therefore fails to allege the required close fit between policy and conduct. Second, the complaint does not allege that Bruce terminated Kennedy's employment on the ground that she refused to "prostitute" herself. *See supra* Section III.B. The wrongful-termination claim also fails, therefore, for the same reason that the quid-pro-quo claim fails.

### E. Tortious Interference

Kennedy alleges that Bruce tortiously interfered with her business relationship with Berkel. Compl. ¶¶ 151–157. "A prima facie case of tortious interference with business relations requires: (1) existence of a valid contractual or other business relationship; (2) the defendant's

15

knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Whitt v. Am. Prop. Constr.*, 157 A.3d 196, 202 (D.C. 2017) (internal quotation marks and alterations omitted). While the D.C. Court of Appeals' precedent is inconsistent, it has generally held that "there is no tortious interference claim for at-will employees in the District of Columbia." *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1040 n.14 (D.C. 2015); *see also Metz v. BAE Sys. Tech. Solutions & Servs.*, 774 F.3d 18, 22–23 (D.C. Cir. 2014) (examining cases and noting inconsistency but concluding that "it is reasonably clear that the general rule in the District of Columbia is that an at-will employment agreement cannot form the basis of a claim of tortious interference with contractual relations" (internal quotation marks omitted)).

The D.C. Court of Appeals reached a conclusion contrary to this general rule in one recent case, *Newmyer v. Sidwell Friends School*, in which a school counselor sued the parent of a student for tortiously interfering with his contract with the school. *See* 128 A.3d at 1027. The Court of Appeals concluded that "an at-will employment relationship of the kind that existed [in the case before it] is a valid and subsisting business relationship for the purposes of a tortious interference claim." *Id.* at 1040. The Court reaffirmed its previous decisions holding that at-will employment cannot give rise to a tortious-inference claim, *id.* at 1040 n.14, but said little to explain what made the difference. The Court did draw one distinction, however: in the case before it—unlike in previous cases—the tortious-interference claim was not brought "against third parties affiliated with [the] employer." *Id.* In *Newmyer*, the defendant parent had no business affiliation with the employer school.

Bruce did have an affiliation with Berkel, in contrast, but Kennedy argues that in a case preceding *Newmyer*, the D.C. Court of Appeals left open the possibility of a tortious-interference

16

claim when a plaintiff can "produce[] facts that suggest that her supervisors procured a discharge of the plaintiff for an improper or illegal purpose." Kennedy Opp'n at 28 (quoting *McManus v. MCI Communications Corporation*, 748 A.2d 949, 958 (D.C. 2000)) (alterations omitted). Kennedy misreads *McManus*. The *McManus* Court granted summary judgment to the defendants for two reasons: (1) the plaintiff had not showed improper or illegal purpose; and (2) tortious-interference claims are not available to at-will employees. The Court could not have been firmer that these were alternative holdings and that a tortious-interference claim was not available. *See id.* at 957–58 ("This court never has held that an employee can maintain a suit for [tortious interference] where her [business relationship] was based on an at-will relationship, *and we do not do so now*. However, even were we to afford [the plaintiff] contractual protections based on her alleged [business relationship] *(which we are not willing to do)*, [the plaintiff] still could not survive summary judgment on this record. . . . [The plaintiff] could survive a summary judgment motion on her claims against [the defendants] *(if available)* only if she produced facts that suggest that they procured a discharge of the plaintiff for an improper or illegal purpose." (internal quotation marks and alteration omitted and emphases added)).

Bruce was employed by Berkel and directly supervised Kennedy. Because that renders this suit dissimilar to *Newmyer* and similar to the several cases in which the D.C Court of Appeals stated that a plaintiff cannot "maintain a suit for [tortious interference] . . . based on an at-will relationship," *id.* at 957, the tortious-interference claim must be dismissed.

### F. Equitable Tolling

Kennedy filed her complaint about twenty-one months after Bruce allegedly raped her, which is outside the limitations period for many of her tort claims. *See* D.C. Code § 12-301(4) (setting a one-year limitations period for "libel, slander, assault, battery, mayhem, wounding,

malicious prosecution, false arrest or false imprisonment"). The defendants move to dismiss six counts on this basis. *See* Defs.' Mem. at 22–24. Kennedy argues that the statute of limitations should be equitably tolled from her alleged rape on September 30, 2015 to the day she obtained counsel on September 29, 2015, which would allow the claims.[2] Kennedy Opp'n at 31–35.

The D.C. Code tolls a limitations period only if the plaintiff is a minor, imprisoned, or—relevant here—mentally incapacitated. *See* D.C. Code § 12-302 ("[W]hen a person entitled to maintain an action is, at the time the right of action accrues . . . non compos mentis . . . he or his proper representative may bring action within the time limit[] after the disability is removed."); Black's Law Dictionary (5th ed. 1979) (defining *non compos mentis* as "[n]ot sound of mind"). Kennedy asks the Court to join the Ninth Circuit in announcing a judicially-created hardship exception to limitations periods. Kennedy Opp'n at 32–33. The D.C. Court of Appeals, however, has been very reluctant to add to the legislature's three enumerated exceptions with its own reasons for tolling. *See, e.g.*, *Johnson v. Marcheta Investors Ltd. P'ship*, 711 A.2d 109, 112 (D.C. 1998) ("District of Columbia law does not recognize the concept of equitable tolling."); *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998) ("Limitations periods . . . must be strictly adhered to by the judiciary. Remedies for resulting inequities are to be provided by the legislature, not the courts." (quotation marks and alterations omitted)); *id.* (recognizing "two limited exceptions to our generally strict application of statutes of limitations: the lulling doctrine and the discovery rule" [neither of which has any application here]); *Sayyad*

---

[2] In support of her equitable-tolling argument, Kennedy asks the Court to consider, in addition to the complaint, a declaration she attached to her opposition to the motion to dismiss. Kennedy Opp'n at 32. When deciding a Rule 12(b)(6) motion, however, a court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). The D.C. Circuit bends that rule for pro se litigants, *see, e.g.*, *Abdelfattah v. DHS*, 787 F.3d 524, 529 (D.C. Cir. 2015), but Kennedy has retained counsel.

*v. Fawzi,* 674 A.2d 905, 906 (D.C. 1996) (rejecting equitable tolling because it was "bound by . . . strict adherence to statutes of limitations"); *Huang v. D'Albora*, 644 A.2d 1, 3 (D.C. 1994) (rejecting an argument because it "boils down to a request that we adopt some sort of equitable tolling, which we have previously refused to do in regard to general statutes of limitations").

But assuming the truth of Kennedy's allegations, the Court cannot conclude as a matter of law that Kennedy was not mentally incapacitated for most of the year between the September 30, 2015 rape and her retention of counsel. "The [D.C. Code] does not itself define *non compos mentis,* but 'the phrase *non compos mentis* generally refers to someone incapable of handling her own affairs or unable to function in society.'" *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 580 (D.C. Cir. 1998) (quoting *Hendel v. World Plan Executive Council,* 705 A.2d 656, 665 (D.C. 1997)). In *McCracken v. Walls-Kaufman*, the D.C. Court of Appeals held that a genuine dispute of material fact existed as to the plaintiff's mental incapacity when she alleged that she had been unable to "handle ordinary affairs" and "unable to function as a normal person" after being raped. 717 A.2d 346, 355 (D.C. 1998). "That she may have reported a rape to the police," the Court wrote, "does not demonstrate as a matter of law that [the plaintiff] was substantially aware of her legal rights." *Id.*

The situation here is similar. Kennedy alleges that in the months following her weeks of rape and abuse at Berkel, she "regularly cried" and "suffered from severe depression and suicidal thoughts." Compl. ¶ 57. Because of this, she found it "difficult . . . to focus, retain information, and learn new tasks" and was fired in a new job for that reason. *Id.* ¶ 61. In August 2016, the emotional trauma caused Kennedy to be hospitalized and diagnosed with post-traumatic stress disorder. *Id.* ¶ 58. She is now no longer able to "work in the construction industry in which she

had been employed for over 15 years." *Id.* ¶ 60. Although Kennedy, like the plaintiff in *McCracken*, took some responsive action after allegedly being raped—here in the form of an EEOC complaint—she alleges that she had trouble performing basic life functions in the aftermath of being raped and abused. For now at least, these allegations are sufficient to sustain her claims.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the defendants' Motion to Dismiss. Dkt. 13. Specifically, Counts 2 and 8 (quid pro quo sexual harassment), Counts 6 and 12 (religion-based discriminatory termination), Count 13 (tortious interference), and Count 16 (wrongful termination) are dismissed with prejudice. Count 23 (negligent infliction of emotional distress) is dismissed without prejudice. The other counts survive. A separate order consistent with this decision accompanies this memorandum opinion.

*[signature: Dabney L. Friedrich]*

DABNEY L. FRIEDRICH
United States District Judge

Date: July 24, 2018

20