## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIMBERLY KENNEDY,

     *Plaintiff*,

     v.

BERKEL & COMPANY
CONTRACTORS, *et al.*,

     *Defendants.*

No. 17-cv-1248 (DLF)

### MEMORANDUM OPINION

Kimberly Kennedy claims that her former boss, Dwayne Bruce, harassed, sexually assaulted, and raped her while she worked at Berkel & Company Contractors (Berkel). Before the Court is the defendants' Motion for Partial Summary Judgment on fourteen of Kennedy's eighteen remaining claims. Mot. for Partial Summ. J., Dkt. 48. For the reasons that follow, the Court will grant the motion as to four claims: negligence; negligent infliction of emotional distress; negligent supervision, retention, and training; and intrusion upon seclusion. The Court will deny the motion as to the remaining ten claims.

## I.    BACKGROUND

Kimberly Kennedy moved to Washington, D.C. in 2015 to find construction work. *See* Def.'s Statement of Material Facts, Dkt. 48-1, ¶ 1.[1] As part of her job search, Kennedy visited a

---

[1] Unless otherwise noted, the facts in this opinion are drawn from the uncontested facts in the defendants' Statement of Material Facts, Dkt. 48-1. *See Hawkins v. District of Columbia*, No. 17-cv-1982, 2020 WL 601886, at *4 (D.D.C. Feb. 7, 2020) ("[I]n ruling on a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted . . . in [the non-moving party's] opposition to the motion." (internal quotation omitted)). Otherwise, the opinion

Berkel construction site and left her resume with Dwayne Bruce.  *Id.* ¶¶ 2–4.  Bruce initially

turned Kennedy away.  *See* Kennedy Dep. 31:15–32:14; Bruce Dep. 33:4–12.  Later that day,

though, Bruce called Kennedy to inform her that Berkel would hire her as a flagger and laborer.

*See* Kennedy Dep. 32:7–12; Def.'s Stmt. of Material Facts ¶ 7.  Kennedy worked for Berkel for a

total of six weeks.  *See* Def.'s Response to Interrogatory 12, Dkt. 48-4 at 12.  Throughout that

period, Bruce served as Kennedy's direct supervisor and superintendent of the site.  *See* Kennedy

Dep. 65:10–16; Def.'s Stmt. of Material Facts ¶ 3 (describing Bruce as "acting superintendent").

At the time, Kennedy was the only woman on the site.  *See* Kennedy Dep. at 251:4–6;

Bruce Dep. at 51:3–5.  She asked Bruce whether she could work "in the hole" (a construction

term for an excavated foundation) along with all the other male employees.  Kennedy Aff. ¶¶

18–19, Dkt. 52-3.  Bruce denied her request, despite the fact that Kennedy had worked in the

hole in previous jobs.  *See id.*; Kennedy Dep. at 34:13–17.  Instead, Kennedy's duties at Berkel

included flagging traffic, filling potholes, and cleaning Bruce's trailer.  *See* Def.'s Statement of

Material Facts ¶ 8.

The parties dispute much of what happened next.  *Compare* Def.'s Stmt. of Material

Facts, *with* Pl.'s Statement of Material Facts, Dkt. 52-1.

Kennedy recalls how Bruce propositioned her inappropriately.  He first asked for hugs

and asked her to be his girlfriend.  *See* Kennedy Dep. at 62:13–14; 69:1–2.  Kennedy informed

Bruce that she was not interested in a relationship with him.  *Id.* at 63:9–11.  She told him that

her religious beliefs dictated that she not date or have any sexual contact outside of marriage.  *Id.*

---

recounts the facts as established in "depositions, answers to interrogatories, and admissions on
file, together with the affidavits" to determine whether there is any "genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56).  The opinion notes
where the facts are disputed.

But Bruce ignored her. *Id.* He hugged her without her consent. *See id.* at 62:13–22. Kennedy told Bruce that the hug made her feel guilty, since it violated her religious beliefs. *Id.* Nevertheless, he continued to forcibly hug Kennedy and rub his erect penis against her body. *See id.*; *id.* at 108:16–18.

Things escalated from there. One day in his trailer on the site, Bruce exposed himself to Kennedy. *See id.* at 59:1–8. Distressed, she left work. *Id.* Bruce later called Kennedy (she gave him her phone number for work-related contact) and asked if she left because "it was rusty." *Id.*; Kennedy Aff. ¶ 34. On Kennedy's birthday, Bruce made an obscene gesture with his tongue which Kennedy interpreted as a sign that he wished to perform oral sex on her. *Id.* ¶ 35. Another time in the trailer, Bruce exposed himself, pushed Kennedy down into a chair, and slapped her repeatedly in the face with his penis. *See* Kennedy Dep. at 87:14–21. He then forced himself into her mouth and made her perform oral sex on him. *Id.* at 70. This happened multiple times. *See* Bruce Dep. at 42:14–17. At one point, Bruce told Kennedy while she was performing oral sex on him that she could not answer the phone because she was busy "doing her job." *See* Kennedy Dep. at 73:4–12.

Kennedy believed Bruce purposely kept her isolated from others. *See id.* at 79:11–22. When Kennedy spoke to other men on the worksite, Bruce got angry. *Id.* One day, Bruce became angry with her when she made small talk with a group of male superintendents. *Id.* Immediately after that, Bruce told Kennedy he was not going to send her to the next worksite and gave her a final, handwritten paycheck. *Id.* at 80. Bruce told her she was being let go because another superintendent felt she was "too soft." *Id.* When Kennedy started crying, Bruce said this was the reason he did not like to hire women. *Id.* at 80:6–8. Kennedy came back to the trailer later to plead for her job. *Id.* at 80:22. Bruce asked if Kennedy wanted him to "put the

3

trailer on lockdown"—a code he used for sex.  *Id.* at 81:2–3.  He then forced Kennedy to perform oral sex and raped her.  *Id.* at 81.  After he was done, he responded to Kennedy's plea for her job with "I'll call you."  *Id.* at 81:12–13.

When Kennedy was later hired by another construction company, one of the workers there was a former Berkel employee who was friendly with Bruce.  *See id.* at 123–27.  Soon after Kennedy arrived, a group of male employees started taunting her.  *See id.*  They leered at her, grabbed their crotches, and sang the song "Superfreak" by Rick James.  *See id.*  Kennedy believes that they did so because Bruce told the former Berkel employee that she and Bruce had had a consensual sexual relationship.  *See id.*

Ultimately, Kennedy suffered severe mental health consequences from the trauma she experienced.  *See id.* at 123:2–8.  She suffered from depression and suicidal thoughts.  *See id.* at 83:13–16.  And she was diagnosed with PTSD and eventually hospitalized.  *See* Kennedy Aff. ¶ ¶ 43–44.  These conditions left Kennedy unable to work.  *Id.*

As for Bruce's side of the story, he does not deny that the sexual acts Kennedy describes occurred.  *See* Bruce Dep. at 12:19–21.  Rather, he claims that the interactions were all consensual.  *Id.* at 28:18–19, 31:1–5.  He also claims he did not tell anyone at Berkel about his sexual relationship with Kennedy until after the police became involved in the investigation (and after employees had already taunted Kennedy at her new job).  *Id.* at 52:10–19, 104.

In June of 2017, Kennedy brought suit against Bruce and Berkel, alleging twenty-four statutory and common law tort claims.  *See* Compl., Dkt. 1.  Kennedy's statutory claims were based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*  Kennedy sued both Berkel and

Bruce under the D.C. Human Rights Act but only Berkel under Title VII.  In addition, Kennedy

brought negligence claims against Berkel and several intentional tort claims against Bruce.

In August of 2017, the defendants filed a motion to dismiss, Dkt. 13.  The Court

ultimately dismissed six of Kennedy's twenty-four claims.  *See* Mem. Op. on MTD, Dkt. 21.

Now, at the summary judgment stage, eighteen of Kennedy's claims remain.  The defendants

move for summary judgment on fourteen of those eighteen claims: Kennedy's eight statutory

claims, Kennedy's three negligence claims against Berkel, and Kennedy's three privacy tort

claims against Bruce.

## II.    LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48

(1986).  A "material" fact is one that could affect the outcome of the lawsuit.  *See id.* at 248;

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable

jury could determine that the evidence warrants a verdict for the nonmoving party.  *See*

*Anderson*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  In reviewing the record, the court "must

draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133,

150 (2000).

It is well established, however, that "a plaintiff opposing summary judgment" must

"substantiate [her allegations] with evidence" that "a reasonable jury could credit in support of

each essential element of her claims."  *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C.

Cir. 2015).  The moving party is entitled to summary judgment if the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

Kennedy maintains eighteen claims against Bruce and Berkel, including statutory and common law tort claims.  The defendants move for summary judgment on fourteen of Kennedy's eighteen claims.

### A.   Title VII

Kennedy brings four claims against Berkel under Title VII:  retaliation (count I); hostile work environment based on sexual harassment (count III); hostile work environment based on religious discrimination (count IV); and discriminatory termination based on sex (count V).  All survive summary judgment.

Title VII of the Civil Rights Act of 1964 forbids employers from discriminating on the basis of an employee's race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e–2(a). For a Title VII hostile work environment claim, an employee must point to conduct so "severe or pervasive" as to create an "objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Title VII also forbids employers from retaliating against an employee because she "has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (internal quotation marks omitted).

As an initial matter, Berkel is vicariously liable for Bruce's actions as Kennedy's supervisor.  When an employee is "harassed by [a] supervisor," "supervisors are treated as the employer's proxy." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per

curiam).  Accordingly, save for any affirmative defense, the employer is "vicariously liable for a supervisor's actions."  *Id.*

Berkel seeks to avoid the presumption of vicarious liability by citing the affirmative defense established in *Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998).  The defense insulates an employer from the presumption of vicarious liability when the employer shows "(i) that it exercised reasonable care to prevent and promptly correct the hostile behavior, *and* (ii) that the employee unreasonably failed to take advantage of the employer's preventive or corrective opportunities." *Ayissi-Etoh*, 712 F.3d at 577–78.  However, the *Faragher* defense cannot preclude liability here.  "No affirmative defense is available [] when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808.  Here, as discussed *infra*, Kennedy has raised a genuine dispute of fact as to whether she suffered a tangible employment action when she was asked to leave the Berkel worksite, not called back, and given a final, hand-written paycheck. *See* Kennedy Dep. at 80:1–5; 103:11.  Thus, the *Faragher* defense does not apply, and Berkel is presumed vicariously liable for Bruce's actions at this stage.  524 U.S. at 808.

Title VII claims "trigger the familiar burden-shifting framework of *McDonnell Douglas*." *Gaujacq*, 601 F.3d at 577 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (internal citation omitted)).  In applying this framework, "the District Court need only resolve one central question when considering a motion for summary judgment: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason [for an adverse employment action] was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 576 (internal quotation marks omitted).

With respect to her Title VII claims, Kennedy has produced such evidence.  As to hostile work environment based on sex, Kennedy testified that Bruce repeatedly harassed, sexually assaulted, and raped her in the workplace.  *See, e.g.*, Kennedy Dep. at 58, 70, 81.  As to hostile work environment based on religion, Kennedy claims that Bruce harassed her about her religious beliefs by accusing her of trying to be a "minister."  *See* Kennedy Aff. at ¶ 26.  Further, Bruce ignored Kennedy's multiple protestations that he was violating her religious beliefs and making her feel guilty with his advances.  *Id.* at 25; Kennedy Dep. at 62:13–22.  Bruce knew Kennedy's religion forbade any sexual contact outside of marriage, yet he repeatedly hugged Kennedy without her consent, rubbed his erect penis against her buttocks, and forced her to perform oral sex.  *See id.* at 62:13–22, 70.  A reasonable jury could find that these acts taken together were "severe or pervasive" enough to create a hostile work environment.  *Forklift Sys.*, 510 U.S. at 21.

As to retaliation and discriminatory termination, a material factual dispute remains as to whether Berkel terminated Kennedy.  *Compare* Bruce Dep. at 59:8–14, *with* Kennedy Dep. at 103:11.  Berkel and Bruce claim that Kennedy was merely "laid off" temporarily.  Bruce Dep. at 59:8–14.  On the other hand, Kennedy claims she was terminated, and points to the fact that she received a final, hand-written paycheck as proof.  *See* Kennedy Dep. at 80, 103:11.  The parties also dispute the reason Kennedy was asked to leave the worksite.  Berkel and Bruce claim that she was laid off pursuant to a nondiscriminatory policy to lay off all flaggers.  *See* Bruce Dep. at 49:10–18.  But Kennedy points to enough evidence "for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason" she was asked to leave.  *Gaujacq*, 601 F.3d at 576 (internal quotation marks omitted).  Namely, she testified that Bruce told her she was not being sent to another worksite because a superintendent felt she was "too soft."  Kennedy Dep. at 80:1–5.  Bruce also stated that he did not like to hire women.  *Id.* at

80:6–8.  Further, a reasonable jury could conclude from the totality of Bruce's actions and comments that he was motivated in part by Kennedy's opposition to his ongoing sexual harassment and abuse.

Berkel contends that Bruce had no authority to hire or fire employees.  *See* Def.'s Statement of Material Facts ¶ 3.  But a reasonable jury could infer from the evidence that Bruce, as the acting superintendent on the site and Kennedy's direct supervisor for the entirety of her employment, exercised discretion over whether to dismiss Kennedy.  *See Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (holding that an employer is vicariously liable for a supervisor's harassment "when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (internal quotation marks omitted)).  Kennedy has pointed to evidence in the record from which a reasonable jury could infer that Bruce possessed such authority.  For example, Bruce was the one who told Kennedy she was dismissed immediately after he saw her talking to other male workers.  *See* Kennedy Dep. at 79–80.  He also handed her the final, hand-written paycheck.  *Id.*  Indeed, Bruce himself implies that he had significant leeway to decide whom to hire and fire at Berkel.  *See* Bruce Dep. at 10:15–17 ("Well, not like I could just do what I wanted to do.  I had to get permission to hire and fire.") In sum, Kennedy's Title VII claims rest in large part on questions of credibility and the weight of the evidence.  Such questions preclude summary judgment.  *See Anderson*, 477 U.S. at 249.

## B.     D.C. Human Rights Act

Kennedy brings four claims under the DCHRA against both Berkel and Bruce: retaliation (count VII); hostile work environment based on sexual harassment (count IX); hostile

work environment based on religious discrimination (count X); and discriminatory termination based on sex (count XI).  All survive summary judgment.

The D.C. Court of Appeals generally interprets the D.C. Human Rights Act as operating in parallel to Title VII.  *See, e.g.*, *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (observing that the D.C. Court of Appeals "follow[s] cases construing Title VII in interpreting and applying the provisions of the [D.C. Human Rights Act] . . . to the extent that the acts use similar words and reflect a similar purpose").  And both "Title VII and DCHRA discrimination claims are assessed pursuant to the three-step framework set forth in *McDonnell Douglas Corp. v. Green*."  *Gaujacq*, 601 F.3d at 576 (citing 411 U.S. 792 (1973)).  Thus, the Title VII analysis above applies to the DCHRA claims as well.

Much like the Title VII claims, several genuine disputes of material fact make summary judgment improper on Kennedy's DCHRA claims.  First, whether Bruce repeatedly harassed, sexually assaulted, and raped Kennedy in the workplace.  *See, e.g.*, Kennedy Dep. at 58, 70, 81. Second, whether Bruce harassed Kennedy about her professed religious beliefs.  *See* Kennedy Aff. at ¶ 26.  Third, whether Kennedy was fired from Berkel or merely "laid off."  *Compare* Bruce Dep. at 59:8–14, *with* Kennedy Dep. at 103:11.  Fourth, whether Kennedy was asked to leave the worksite because of a general policy to lay off all flaggers, or because a superintendent felt she was "too soft."  *Compare* Bruce Dep. at 49:10–18, *with* Kennedy Dep. at 80:1–5. Weighing the competing evidence on each side of these disputes will be the province of the jury. *See Anderson*, 477 U.S. at 249.

### C.     Negligence

Kennedy brings three negligence claims against Berkel: negligent supervision, retention, and training (count XIV); negligence (count XV); and negligent infliction of emotional distress

(count XXIII).  None survive summary judgment.  For each of these claims, Kennedy fails to raise a genuine dispute of material fact as to whether Berkel had actual or constructive notice of Bruce's actions toward Kennedy.  Put differently, Kennedy has not pointed to sufficient evidence in the record for a reasonable jury to conclude that Bruce's actions were foreseeable.  For this reason, Berkel is entitled to judgment as a matter of law on Kennedy's negligence claims.

In contrast to the statutory claims discussed above, these negligence claims depend not on Berkel's vicarious liability through Bruce but Berkel's direct liability because of its own actions and omissions.  "There are circumstances under which an employer can be held liable for intentional acts committed by an employee who causes harm, although acting outside the scope of his or her employment.  That liability is predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence."  *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002).

The elements for Kennedy's negligence claims are as follows.  For a negligent supervision, training, and retention claim, a plaintiff must show that: "the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."  *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009) (quoting *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001)).  "Furthermore, a plaintiff must show that the employer's negligence was a substantial factor in causing the plaintiff's injury."  *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 31 (D.D.C. 2011) (citing *Tarpeh-Doe v. United States*, 28 F.3d 120, 124 (D.C. Cir. 1994)).

For a negligence claim, a plaintiff "has the burden of establishing the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the

deviation and the plaintiff's injury." *Young v. District of Columbia*, 752 A.2d 138, 145 (D.C. 2000) (internal quotation marks omitted). "It is axiomatic that under a negligence regime, one has a duty to guard against only *foreseeable* risks." *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 911–12 (D.C. Cir. 2006) (internal quotation marks omitted, emphasis added). "The foreseeability required when the harm is caused by the criminal act of a third party, however, is more exacting. Because of the extraordinary nature of criminal conduct, liability depends on a heightened showing of foreseeability in the context of an intervening criminal act." *Id.* at 912 (internal quotation marks omitted).

For a negligent infliction of emotional distress claim, a plaintiff has two options. She can show that: "(1) the plaintiff was in a zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for her own safety, and (4) the emotional distress so caused was serious and verifiable." *See Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 363 (D.D.C. 2014). Or, a plaintiff can proceed under the "special relationship" test established in *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810–11 (D.C. 2011) (en banc). Under that theory, a plaintiff must show that "(1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Id.*

Overall, Kennedy has failed to raise a genuine dispute of fact as to whether Bruce's actions were foreseeable by Berkel. This requires summary judgment on each of the three negligence claims. *See Novak*, 452 F.3d at 911–12 ("It is axiomatic that under a negligence

regime, one has a duty to guard against only foreseeable risks." (internal quotation marks omitted)).

The parties do not meaningfully dispute that Berkel had no "actual . . . knowledge" that Bruce "behaved in a dangerous . . . manner." *Godfrey*, 559 F.3d at 571.  Indeed, Kennedy admits that she did not inform anyone at Berkel about Bruce's actions at any point during her employment or afterwards.  *See* Kennedy Dep. at 65:8–16.  Bruce also testified that he told no one in the relevant time period.  *See* Bruce Dep. at 51:17–20.  And Kennedy points to no other means by which Berkel might have acquired actual knowledge.

As to constructive knowledge, Kennedy concedes that Berkel had no evidence "which would show that [Bruce] had any history of or proclivity for sexual harassment or sexual violence."  *See* Pl.'s Opp'n at 5–6, Dkt., 52.  Rather, she says that "Berkel . . . should have known[] that they had improperly trained and supervised Mr. Bruce."  *Id.* at 9–10.  She focuses on Berkel's employee onboarding procedures, which she argues were so "inadequate" "that it was reasonable to foresee that . . . Mr. Bruce [would] sexually harass, sexually assault, rape, and discriminate against the Plaintiff."  *Id.* at 10.  She notes, for example, that Berkel provided orientation training on several topics but did not provide separate training on sexual harassment during employee orientation.  *Id.* at 9.  She also notes that Berkel instructed employees to report sexual harassment issues to the company's AA/EEO officer, who was located in another state. *Id.*

Taken together, these facts do not create a genuine dispute as to whether Berkel knew or should have known that Bruce behaved in a dangerous manner.  True, Bruce now claims that he did not realize at the time that his interactions with Kennedy were wrong (despite receiving and reviewing the sexual harassment policy).  *See* Bruce Dep., 13:2–12, 14:10–15.  But his

subjective recollection, even if credited by a jury, does not go to what Berkel would have or should have known at the time.  On that front, Kennedy has not pointed to evidence in the record showing that Berkel knew or had any reason to know that Bruce was sexually abusing her.  To the contrary, Berkel would have expected to be informed of any ongoing sexual harassment issues in the workplace, pursuant to the sexual harassment policy provided to all employees.  *See* Berkel Employment Manual at 11, Dkt. 48-6.  Berkel provided employees with its sexual harassment policy as a matter of course.  *See* Interrogatories at 10 (Response to Interrogatory 10), Dkt. 48-4.  Employees were required to read the policy and sign a form acknowledging that they had done so.  *Id.*  That policy encouraged employees to report all sexual harassment promptly, to a supervisor or to a designated employee specifically charged with handling workplace harassment issues.  *See* Berkel Employment Manual at 11.  And Bruce admitted that he received and reviewed that policy.  *See* Bruce Dep., 13:2–12.

Kennedy provides one further, alternative argument on causation for her negligent infliction of emotional distress claim.  She argues that Berkel owed her a "special relationship." *See Hedgepeth*, 22 A.3d at 799–800, 810–11.  To succeed on this theory, Kennedy would have to show that Berkel "assumed a duty to avoid inflicting emotional distress" because "the underlying relationship or undertaking" between them was "such that it [wa]s not only foreseeable, but *especially likely*, that the defendant's negligence [would] cause serious emotional distress to the plaintiff."  *Id.* at 799–800 (emphasis added).  She would also have to show that the relationship was one that by its nature "implicated [her] emotional well-being."  *Id.* at 812.  Examples of such relationships include "psychiatrist/therapist and patient," *id.* at 813, a funeral home's handling of a corpse, *id.*, and "persons who are appointed to act as guardians and counsel for those who are especially vulnerable: children, the elderly, and the disabled."  *Id.* at 814.

Putting aside whether Kennedy improperly raised this argument for the first time in her opposition to summary judgment, *see* Bruce Reply at 11, Dkt. 54, the argument fails as a matter of law.  As discussed above, Kennedy has not met the usual standard of foreseeability, let alone the "especially likely" heightened showing.  *Hedgepeth*, 22 A.3d at 799–80.  In the end, Kennedy's relationship with Berkel was one of an employee and an employer.  And "[m]erely alleging an employer-employee relationship foreclose[es] any special relationship liability." *Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 31 (D.D.C. 2018) (internal quotation marks omitted).

In sum, summary judgment is proper as to Kennedy's three negligence claims against Berkel.

### D.    Privacy Torts

Kennedy brings three privacy tort claims against Bruce: intrusion upon seclusion (count XX); defamation (count XXIV); and public disclosure of private facts (count XXI).

#### 1.    *Intrusion upon seclusion*

"The tort of intrusion upon seclusion has three elements: (1) an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination, . . . (2) into a place where the plaintiff has secluded himself, or into his private or secret concerns, . . . (3) that would be highly offensive to an ordinary, reasonable person."  *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989) (internal citations omitted).

"The types of invasion intrinsic in the tort of intrusion upon seclusion are . . . harassment, . . . peeping through windows or into other locations in which a plaintiff has chosen to seclude himself, . . . opening personal mail, . . . eavesdropping on private conversations, . . . entering a

plaintiff's home without permission or searching his or her belongings, . . . examining a plaintiff's private bank account, . . . or other invasions of that nature." *Id.* at 1217–18 (internal citations omitted).

In this case, Kennedy bases her intrusion upon seclusion claim on a phone call she received from Bruce after work hours.  She left work because Bruce had exposed himself to her in the trailer.  *See* Kennedy Dep. At 59:1–8.  Bruce later called Kennedy and asked if she ran because "it was rusty."  *Id.*  Kennedy had given Bruce her phone number for work-related contact.  *See* Kennedy Aff. ¶ 34.

Kennedy's claim cannot succeed as a matter of law, even if the jury credits her account, because she cannot satisfy the first element of the test: "an invasion or interference by physical intrusion, by use of a defendant's sense of sight or hearing, or by use of some other form of investigation or examination."  *Wolf*, 553 A.2d at 1217.  Because she has not pointed to "an invasion or interference by physical intrusion," *id.*, the facts would have to support a showing of "some other form of investigation or examination."  *Id.*  Kennedy has presented no case law indicating that a single phone call can constitute the type of "investigation or examination" covered by this tort.  *See* Kennedy Op. at 12–13.  Further, she has pointed to no evidence that Bruce conducted an "investigation or examination" to retrieve her phone number.  *Wolf*, 553 A.2d at 1217.  Kennedy gave Bruce her phone number for work-related calls.  *See* Kennedy Aff. ¶ 34; Pl.'s Opp'n at 12.  Thus, Bruce did not conduct an "investigation or examination" that invaded Kennedy's privacy in order to retrieve Kennedy's phone number.  Nor is the single phone call itself, though highly inappropriate, an "investigation or examination."  *Wolf*, 553 A.2d at 1217.  *Cf. Alexander v. F.B.I.*, 971 F. Supp. 603, 610 (D.D.C. 1997) (finding the "collection and examination of FBI files" to be an examination for purposes of intrusion upon seclusion).

Because Kennedy has raised no genuine dispute of material fact on this essential element of an intrusion upon seclusion claim, summary judgment is proper.

        2.     *Defamation*

To succeed on a claim of defamation, a plaintiff must show: (1) that she was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm. *See Farah v. Esquire Mag.*, 736 F.3d 528, 533–34 (D.C. Cir. 2013).

Kennedy has raised genuine disputes of material fact as to each element. Kennedy believes that Bruce shared the false and defamatory statement that they had a consensual sexual relationship with at least one other Berkel employee. *See* Kennedy Dep. at 123–27. She believes this because once she arrived at her new job, male employees taunted her with sexual innuendo, implying that she was a "super freak." *See id.*

Although Kennedy has not shown with certainty that Bruce published the false and defamatory information, *see* Bruce Reply at 5, certainty is not required at the summary judgment stage. Rather, "at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Kennedy has pointed to enough circumstantial evidence that a reasonable jury could infer that Bruce was the source of the information. For example, she noted that she had never experienced similar taunts in her entire career in construction. *See* Kennedy Dep. at 123–27. And she only experienced them for the first time, just after she left Berkel. *Id.* Further, one of the employees at the new site was a former Berkel employee and was friendly with Bruce. *Id.* And Kennedy said that she never talked with anyone else at Berkel about what went on between

Bruce and her, so Bruce was the only logical source of the information. *See id.* at 65:6–16. Kennedy has also raised a genuine dispute as to whether the statement was false, since she testified in great detail about how the sexual acts were not consensual. *See, e.g., id.* at 62, 70, 72–73, 108. Finally, Kennedy has raised a genuine dispute as to whether she suffered actual harm from Bruce's disclosure, given her extensive psychological suffering after the taunting. *See id.* at 83:13–16. Thus, her defamation claim survives.

### 3. *Public disclosure of private facts*

To prevail on a claim of public disclosure of private facts, a plaintiff must prove "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern and (5) which would be highly offensive to a reasonable person of ordinary sensibilities." *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 190 (D.D.C. 2016) (quoting *Wolf*, 553 A.2d at 1220).

Kennedy's public disclosure of private facts claim rises and falls on the same factual dispute as the defamation claim. That is, whether Bruce published that he and Kennedy engaged in sexual acts. Here too, Kennedy provides sufficient circumstantial evidence for a jury to infer that Bruce told the Berkel employee who later worked at a different site with Kennedy that he and Kennedy had had sex. *See supra* III.D.2.

Of note, the public disclosure of private facts claim differs from the defamation claim in that it does not require a showing that the published statement was false. *Compare Kumar*, 174 F. Supp. at 190, *with Farah*, 736 F.3d at 533–34. Thus, a jury need only find that Bruce published the true fact of their sexual intercourse—not the allegedly false statement that the interactions were consensual—for Kennedy to prevail on this claim. Given the genuine dispute

of material fact as to whether Bruce communicated that fact to others, Kennedy's public disclosure of private facts claim survives summary judgment.

## CONCLUSION

For the foregoing reasons, the defendants' Motion for Partial Summary Judgment is granted in part and denied in part.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

August 20, 2020